## UNITED STATES DISTRICT COURT
## FOR THE DISICT OF RHODE ISLAND

| | | |
|---|---|---|
| **GREENWICH BUSINESS CAIPTAL, LLC,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **vs.** | : | **Case No.:** |
| | : | |
| **HIGHMORE GROUP ADVISORS, LLC,** | : | |
| **doing business as HIGHMORE GROUP;** | : | |
| **DIPAK JOGIA; GOLENBOCK EISEMAN** | : | |
| **ASSOR BELL & PESKOE LLP,** | : | |
| **MICHAEL S. DEVORKIN; and** | : | |
| **ELIZABETH C. CONWAY,** | : | |
| | : | |
| **Defendants** | : | |

## COMPLAINT

### Parties

1.      Plaintiff, Greenwich Business Capital, LLC ("GBC") is a duly organized and existing Rhode Island limited liability company, having a principal place of business located at 100 Centerville Road, Suite 1, Warwick, Rhode Island.  GBC was formerly known as Ponte Investments, LLC.

2.      Upon information and belief, Defendant, Highmore Group Advisors, LLC, doing business as Highmore Group ("Highmore"), is a duly organized and existing Delaware limited liability company, having a principal place of business located at 750 Lexington Avenue, New York, New York.  Further, upon information and belief, Highmore is a majority Member of non-parties, BFG 104, LLC ("BFG") and Banana Funding Group, LLC ("Banana") (collectively, the "Banana Entities"), and, as such, exercises dominion and control over the Banana Entities.

3.      Upon information and belief, Defendant, Dipak Jogia ("Jogia") is the Managing

Member and Co-Founder of Highmore, and maintains a mailing address at 750 Lexington Avenue, New York, New York. Even more, upon information and belief, at all times relevant hereto, Jogia is the Managing Member of the Banana Entities, and each of them, and, as such, exercises dominion and control over the Banana Entities.

4.    Upon information and belief, Defendant, Golenbock, Eiseman, Assor Bell & Peskoe, LLP ("GEABP") is a duly organized and existing New York limited liability partnership, having a principal place of business located at 711 Third Avenue, New York, New York. Even more, upon information and belief, at all times relevant hereto, GEABP is a business actively engaged in the practice of law, and represents the Banana Entities as legal counsel.

5.    Upon information and belief, Defendant, Michael S. Devorkin ("Devorkin") is a duly licensed New York attorney that maintains a mailing address of 711 Third Avenue, New York, New York. Even more, upon information and belief, at all times relevant hereto, Devorkin is employed by GEABP, and, further, acts as legal counsel to the Banana Entities.

6.    Upon information and belief, Defendant, Elizabeth C. Conway ("Conway") is a duly licensed New York attorney that maintains a mailing address of 711 Third Avenue, New York, New York. Even more, upon information and belief, at all times relevant hereto, Conway is employed by GEABP, and, further, acts as legal counsel to the Banana Entities.

<u>**Jurisdiction**</u>

7.    This Court has jurisdiction in this matter pursuant to 28 U.S.C. §1332(a)(1) insofar as there is complete diversity of citizenship by and among the parties hereto, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

8.      Venue is properly in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events and/or omissions herein, including GBC's principal place of business, giving rise to the claims for relief in this matter occurred in this district.

**Preliminary Background**

9.      GBC is a small Rhode Island business, which, among other things, provides merchant cash advance ("MCA") funding to merchants.

10.     Upon information and belief, GEABP is a New York law firm that purports to provide professional legal services directly to clients, such as the Banana Entities. At all times relevant hereto, Devorkin and Conway, and each of them, are employed by GEABP.

11.     Upon information and belief, beginning at least as early as 2017, and continuing through early 2023, the Banana Entities, and each of them, were in the business of advancing funds to funding companies, such as GBC, that purchased future receipts from merchants. The Banana Entities advanced said funding pursuant to agreements called "Master Funding Agreements" ("MFAs") and "Purchase and Sale Agreements" ("PSAs"), respectively. Upon information and belief, 104 is a wholly owned subsidiary of BFG.

12.     The two (2) MFAs entered into by and between GBC and BFG in or about November, 2020, and June, 2022, respectively, were nearly identical, except for the term "remittance." Specific or particular funding transactions under the MFAs were documented by each of the individual PSAs.

13.     The MFAs make it clear that, in pertinent part, "*[i]t is therefore agreed by [BFG] and [Greenwich] that: if the merchant cash advance transactions [that Greenwich enters into with their merchants] fail to [pay] generate the revenue anticipated by [Greenwich ], and the*

*full amount anticipated by [BFG] is not collected then: (x) if [Greenwich ] has not otherwise breached this Agreement, [Greenwich] would not owe anything to [BFG]."*

14.    Upon information and belief, the PSAs used by BFG were drafted or prepared by GEABP, and, more particularly, Devorkin.

15.    Each PSA that 104 entered into with GBC contained the identical assignment and payment language, which included, among other things, material representations and warranties, events of default, default rights and remedies, a security agreement, a personal guaranty, and automated clearing house ("ACH") authorization terms.

16.    In connection with the execution of a PSA, GBC was required to post all of the MCA Purchase & Sale of Future Receipts Agreement entered into by and between GBC and its merchants on the Banana Entities so-called "BE System" for tracking purposes only.  Upon information and belief, the BE System is the proprietary software, technology and business technology owned by the Banana Entities that provided these entities with tracking and reporting of "right to receive" ("RTR") reporting system and cash management software.

17.    In addition, included as part of each PSA was a personal guaranty, upon the event of a default, purportedly permitting BFG to obtain a judgment against an individual employee of GBC personally.

18.    On or about November 18, 2020, GBC entered into an MFA with 104 (the "2020 MFA").  Subsequent thereto, on or about December 15, 2020, GBC entered into the first PSA with 104 ("PSA #1").

19.    PSA #1 was identical in form and substance, excepting the remittance amounts and fees, to subsequent PSAs #2 - #61.

4

20.    As part of the contemplated transactions GBC provided 104 with the (i) its MCA agreements, (ii) personal guaranty, (iii) authorization the payment, and (iv) executed the applicable PSA.

21.    Pursuant to the terms of the PSAs, the Banana Entities agreed receive the future RTR *only* from the merchants listed in Schedule A of the particular PSA.

22.    The "Withdrawal Schedule" per period, was to be paid in equal proportional twelve (12) month installments, less any merchants that default.  The Withdrawal Schedule amount (the "WS Amount") is the principal amount of funds the Banana Entities advanced to GBC, plus fifteen percent (15.0%).  The Banana Entities created the "formula" of the WS Amount multiplied by 1.15.  Clearly stated in the MFAs that 104 was required to reduce the amounts by unpaid merchant cash advances in the PSAs. Said differently, the PSAs stated that the same were "No Recourse to MCA[GBC]", meaning that if a merchant defaulted with GBC, GBC was, in turn, not liable or responsible to repay that merchant's portion of the "Remittance Amount" to the Banana Entities, or either of them.  The MFAs make clear that the Banana Entities, and, more particularly, 104, are not entitled to collect more than the WS Amount[1] x 1.15.

23.    On or about December 21, 2020, BFG received its first installment payment from GBC under PSA #1.  Despite the agreements being by and between GBC and 104, it was BFG that funded the transactions with GBC, and, further, to whom GBC made the required

---

[1] After Judge Lewis Liman's ruling in *Fleetwood Services v. Ram Capital Funding LLC*, 2022 U/S. Dist. LEXIS 100837 (S.D.N.Y. 2022), GEABP and/or Devorkin simply changed the MFA term "Withdrdwal Amount" to 'Remittance Amount", but continued to implement the same agreement formula and practices.

installment payments pursuant to PSAs. Thereafter, in accord with PSA #1, and subsequent PSAs, GBC made all of the required monthly payments to BFG up through, and including, June, 2023.

24.     With regard to PSA #1, and all other subsequent PSAs, through June, 2023, all required monthly payments under said PSAs were timely and fully paid by GBC to BFG despite the fact that the Banana Entities, or either of them, failed and/or refused to remove merchants that defaulted with GBC from the required monthly payments or otherwise reduce said payments to account for defaulted merchants as otherwise required by the MFAs and PSAs. As a result, the Banana Entities were substantially overpaid by GBC pursuant to the PSAs.

25.     Notwithstanding the provisions regarding reconciliations in the MFAs and/or PSAs, and GBC's demands for the same, as of this date, neither Highmore, Jogia, GEABP, Devorkin and/or Conway, or any of them, have ever performed a reconciliation with regard to the GBC PSAs. In fact, upon demand GBC has been regularly advised that the Banana Entities are, in fact, wholly unable to perform any such reconciliation. Even more, to date, neither Highmore, Jogia, GEABP, Devorkin and/or Conway have ever returned any funds to GBC on account of overpayments.

26.     GBC, by and through counsel, has demanded funds be returned and/or the excess funds be repaid, plus the usurious interest, which has not occurred.

27.     Regardless of any provision in the MFAs and/or PSAs relative to reconciliation, Highmore, Jogia, GEABP, Devorkin and/or Conway have failed and/or refused to review any of the MCAs that GBC entered into with corresponding merchant accounts to determine the proper amount of the required installment payment(s), and thus, never reconciled any PSA with GBC.

28.     For example, GBC has demanded that Highmore, Jogia, GEABP, Devorkin and/or Conway, or any of them, account for the payments that have been received; however, Conway and/or GEABP have failed and/or refused to correctly and/or accurately do so.

29.     The Banana Entities' unlawful collection practices have come into focus, as exposed in *BFG 104 LLC v. Greenwich* (New York County Supreme Index No. 6252255/2023) (the "New York Action").  In that proceeding, the Hon. Andrea Masley explicitly directed to Conway that "you do not get to collect … where you can just take any money for the plaintiff and apply it where you want. You are owed what you are owed under the purchase and sale agreement … you do not get to collect everything, everything that the plaintiff brings in" – rather the Banana Entities can *only* collect from merchants identified explicitly in an operative PSA that has not otherwise been paid off or "closed out" by the Banana Entities. The Court notably went on to reprimand Conway as follows: … "and just so you know, I will seriously consider contempt, seriously, I am done with you … ."

30.     In particular, Conway has fabricated terms that do not exist in the MFAs and/or PSAs entered into between GBC and 104.  For example, there is no such term as "Remedy RTR", "Replacement RTR", and/or "New RTR" that can be collected on by the Banana Entities; however, upon information and belief, GEABP, Devorkin and/or Conway, or any of them, has continued to direct the Banana Entities to collect upon such merchants that are otherwise not listed or identified on any Schedule A appended to an "open" PSA.  Conway is going to great efforts to rewrite history and cajole the court with material misrepresentations of fact and/or omissions of material fact in her filings and court appearances in the New York Action by stating that 104 and/or BFG is entitled to *all* of the Purchased RTR.  However, that is patently and

unequivocally false.  Even a cursory reading of the MFAs and/or PSAs make clear that the

Banana Entities are only entitled the so-called Withdrawal Amount or "Remittance Amount",

less any merchant cash advances that defaulted.

31.    As recently as September 17, 2024, Conway was admonished in the New York

Action for attempting to do just what the court in that matter had previously prohibited: "[I]'m

interrupting you because it is now my understanding that you substituted those disqualified

merchants with another merchant.  You collected from that merchant B, and now you want to

collect from merchant A.  Bottom line is: You can't collect twice. ... And if I find that you are

attempting to collect the same thing twice, you're done.  You're out.  You're not getting it."

32.    GEABP's, Devorkin's and/or Conway's tactics are not without precedent. In the

related New York case more commonly known, and identified, as *Avanza Group, LLC v. BFG

102, LLC*, Index No.: 651927/2023 (the "Avanza Matter"), Conway in particular purposefully

engaged in a campaign to sabotage Avanza Group, LLC ("Avanza"), another MCA funder that

that the Banana Entities advanced funds to, by transmitting a factually unfounded and legally

misplaced communication to Avanza's MCA clients on or about April 14, 2023, wherein she

plainly misrepresented as follows:

> Dear Sir/Madam:
>
> This firm [GEABP] represents BFG 102, LLC[2] ("BFG") and we
> write in connection with the above-referenced Merchant
> Agreement between  ... ("You") and Avanza, whereby Avanza
> purchased from You all accounts, receipts, contract rights,
> payment intangibles, general intangibles and other obligations
> arising from or relating to the payment of monies from You to

---

[2] Upon information and belief, BFG 102, LLC is another wholly owned subsidiary of BFG.

Avanza under the above-referenced Merchant Agreement (the "Purchased RTR").

Please be advised that BFG has purchased Avanza's right, title and interest in and to the Purchased RTR pursuant to a certain Master Funding Agreement between BFG and Avanza ("MFA"), and related agreements (collectively, the "Factoring Agreements"). Avanza has defaulted on its obligations under the Factoring Agreements, including but not limited to, making timely payments to BFG based on the Purchased RTR subject to the Merchant Agreement. As Avanza is aware, upon Avanza's default, the Factoring Agreements permit BFG to divert ACH collections to BFG's own account until its obligations are satisfied under the agreements.

We write to provide You with notice that BFG has exercised this right, and will work with the ACH provider and Avanza directly to effect such payment. We request, however, that you continue to make any payments required under the Merchant Agreement, as You have done previously. Any attempts to divert such payments on account of the Purchased RTR to another ACH provider or any third party other than BFG will be viewed as wrongful interference with BFG's contractual rights. If You receive any such requests from Avanza, You should refuse those wrongful instructions and contact the undersigned immediately. Should You have any questions or require any additional information, please feel free to contact me.

Sincerely,

Elizabeth C. Conway

33.    In the Avanza Matter the Banana Entities were faced with a temporary restraining order, which would not be hard until May 15, 2023, preventing the parties from "high jacking" Avanza's RTR in order to pay Highmore, who, upon information and belief, was one of the Banana Entities' largest creditor.

34.     Upon information and belief, desperate to satisfy its obligations to Highmore, the Banana Entities, by and through Jogia, GEABP, Devorkin and/or Conway, set their sights on GBC in an effort to satisfy the Banana Entities' obligations to Highmore.

35.     The Banana Entities, now legally displaced even further Conway's April 14, 2023 letter in the Avanza Matter causing millions in RTR to default, on or about May 9, 2023, 104 initiated the New York Action as against GBC and others.  In so doing, the Banana Entities, by and through Highmore, Jogia, GEABP, Devorkin and/or Conway, or any of them, engaged in a concerted campaign, which continues to this day, to attack any and all of GBC's MCA merchants and attempt to collect whatever amounts they could without ever providing any reconciliation or accounting with regard to the MCA merchants.  In the course of the New York Action, GEABP, Devorkin and/or Conway have made, and continue to make, material misrepresentations or fact and/or omissions of material fact in the attempt to distort the truth, confuse the New York Supreme Court and "grab" as much cash as they can from GBC's merchants varying from MFAs and/or PSAs authored by GEABP and/or Devorkin.

36.     Notwithstanding the lack of any nexus to the terms that Conway has made up as stated above, which do not exist in the agreements authored by GEABP and/or Devorkin, it is clear that Conway does not otherwise understand complex financial products because a dive into her professional biography as published by GEABP holds Conway out to have expertise in the Food, Beverage, Hospitality, Labor, Employment, Litigation, Alternative Dispute Resolution areas of the practice of law.  It is undisputed that GEABP, as published on its own website, has any number of skilled and/or experienced attorneys within the firm relating to financial

instruments or products, as well as creditor rights, and, despite the same, has failed and/or refused to properly supervise Devorkin and/or Conway.

37.     The areas of law related to the Banana Entities' relationship with GBC, namely Corporate, Mergers and Acquisitions and Venture Capital, Leveraged Finance, Securities & Corporate Governance, and Creditor's Rights, which are the areas of lending and finance pertaining to MCAs, are areas of the law in which Conway does not typically practice. The foregoing are conspicuously absent from Conway's background.

38.     GEABP, and, more particularly, Devorkin, who, upon information and belief, drafted or prepared the MFAs and/or PSAs, failed and/or was negligent when he should have acted reasonably and with all proper due diligence in assigning one of the twenty plus (20+) attorneys at GEABP, including Devorkin, that do, in fact, practice regularly in the Corporate, Mergers and Acquisitions and Venture Capital, Leveraged Finance, Securities & Corporate Governance, and Creditor's Rights areas when litigating in the New York Action.

39.     New York law applies to the interpretation and construction of the MFAs and PSAs, and there is no conflict between the relevant New York laws and Rhode Island laws. New York and Rhode Island law applies because of the agreements choice of law, and both State's law apply the same principles in determining whether a transaction constitutes a true sale of merchant cash advances or a secured loan.

40.     The hallmark of a loan is that the lender is absolutely entitled to repayment under all circumstances, or said differently, the principal sum is repayable absolutely, under all circumstances, as was here when the Banana Entities continued to take funds from other

merchant cash advances that were not on any of the PSAs, or for merchants that defaulted with GBC.

41.    The analysis usually is guided by examining three (3) factors to determine whether repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.

42.    A reconciliation provision is relevant for an MCA because it can shift the risk of non-payment away from the merchant by allow the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof). If a merchant is doing poorly, the merchant will pay less and will receive a refund of anything taken by the company exceeding the specified percentage. Here, there was no reconciliation done, even though the Banana Entities actually disavowed or disqualified merchants from its BE System as defaulted knowing that Greenwich could not collect from them. The Banana Entities purposefully did not reconcile notwithstanding being in possession of the necessary information to reconcile at all relevant times. GEABP, Devorkin and/or Conway, as counsel to the Banana Entities, provided the New York Supreme Court with certain materials and/or charts or graphs in contravention of their clients' own interests because the same plainly demonstrate that the Banana Entities never reconciled any of the PSAs. If anything, GEABP, Devorkin and/or Conway, as counsel to the Banana Entities, to the extent that any of them had any understanding of the merchant cash advance industry, the MFAS and/or the PSAs, or any of them, should not have, in fact, provided the court in the New York Action with proof that the Banana Entities

never reconciled, and which the Banana Entities disavowed or disqualified a merchant and never adjusted the amount owed when GBC was not otherwise in default.

43.    Moreover, if the amount of monthly payments can and/or should change pursuant to a reconciliation(s), then the term of the agreement is necessarily not finite.  Here, the amount was titled the "Withdrawal Amount" or "Remittance Amount" remained the same or static for each period pursuant to the applicable PSAs.  Upon information and belief, GEABP, and more particularly, Devorkin, drafted and prepared the MFAs and/or PSAS, and, in so doing, attempted to disguise the same as factor agreements rather than loans, even though, at all relevant times, the Banana Entities treated the financing as *de facto* loans, and not factors.  Highmore's, Jogia's GEABP's, Devorkin's and/or Conway's attempts to "grab" all of the GBC RTR puts the *de facto* Banana Entities loans above New York usury, and make the same criminally usurious.

44.    On the most elementary level, the MFAs and PSAs place an affirmative and mandatory payment obligation on GBC and not on any merchant debtor to repay the Banana Entities, and prescribes that amount not as a percentage of the receipts from merchants but as an absolute figure of Withdrawal Amount or Remittance Amount monthly regardless of whether RTR is collectible or not.

45.    Thus, GBC, and not the Banana Entities, assumed sole responsibility for ensuring that the specified percentage is paid to the Banana Entities. The MFAs and/or PSAs have none of the characteristics of the sale of MCAs in terms of the transfer of risk and rewards.

46.    Even right up until the last court appearance in the New York Action, *to wit*, on or about September 17, 2024, Highmore, Jogia, GEABP, Devorkin and/or Conway continue to be strident and overly broad in their reach, and interpretation of the language in the agreements as to

13

be essentially vacuous. Highmore, Jogia, GEABP, Devorkin and/or Conway continue to openly seek the Court's imprimatur to capture not just the "Withdrawal Amount(s)" or "Remittance Amount(s)", less any GBC MCAs that default and/or defaulted, but all of the funds derived from Greenwich RTR in an effort improperly furnish the Banana Entities the right to *all* of GBC's revenues up to the full uncollected purchased amounts.

47.     Tellingly, Highmore, Jogia, GEABP, Devorkin and/or Conway are unable to identify any revenue that GBC could receive from its MCAs that would not somehow be captured by its broad interpretation, and it is difficult to imagine what revenue would not fall within it.

48.     Furthermore, the rights and risks that the Banana Entities purport to obtain do not bear any resemblance to the purchase of assets. That obligation rests entirely on GBC as it is required to remit the specified "Withdrawal Amount(s)" or "Remittance Amount(s)" regardless of GBC's ability to collect upon its MCAs. The risk of non-payment thus falls entirely on GBC, and disingenuously and improperly empowers attempts by Highmore, Jogia, GEABP, Devorkin and/or Conway to collect the entire purchased amounts.

49.     PSAs, as in this case, and including such documents language of the Banana Entities' purported purchase of account receivables that is unsupported by actual receivables dedicated to repayment, does not shield it from the judicial determination that it contemplates a criminally usurious transactions, which is void *ab initio* as a matter of law.

50.     Under the agreements, the Banana Entities are entitled to only the "Withdrawal Amount(s)" or "Remittance Amount(s)," and not more.

51.     Thus, GBC's performance is capped at the "Withdrawal Amount(s)" or "Remittance Amount(s)" because of the amount GBC received, and the Banana Entities are

14

receiving no benefit from the better-than-expected performance. Indeed, so long as GBC has enough money to cover the incremental payment amount, less any merchant cash advance default, if occurred from merchants listed or identified on Schedules A appended to "open" PSAs, GBC can use the proceeds - the balance of which belong to GBC - from merchant transactions or payments however it likes. Even though GBC enjoys the use of the proceeds, Highmore, Jogia, GEABP, Devorkin and/or Conway are holding up the funds. In fact, counsel for GBC has made attempts to have the funds accounted for released, but Highmore, Jogia, GEABP, Devorkin and/or Conway has refused to do so. The court in the New York Action has been clear that the Banana Entities have no rights of absolute ownership - it does not have the right to possess, use, or convey any of the merchant accounts that are not on Schedule A of the any "open" PSAs, or in any amount above and beyond that which the Banana Entities advanced on account of any such specified merchants.

## Nature of Action

52.     GBC brings this action as against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, for their willful, wanton and intentional violation of applicable law, as well as in derogation of the directives of New York Supreme Court, which said wrongful conduct directly and proximately resulted in the wholesale destruction of GBC's business, including without limitation complete erosion and/or decimation of its most valuable asset, *to wit*, GBC's MCA receivables portfolio, which had a value of approximately $16,025,622.69 on or about April 30, 2023, of which $4,475,280.93 was owed to the Banana Entities and $11,516,560.51 was due GBC.

53.     Following BFG having obtained a preliminary injunction as against GBC on or about June 21, 2023, in the New York Action, which said preliminary injunction was premised upon a series of material misrepresentations of fact and/or omission of material fact by GEABP, Devorkin and/or Conway as to the nature, terms and extent of BFG's agreements with GBC[3], Highmore, Jogia, GEABP and/or Conway, and each of them, participated in the willful, wanton and intentional campaign to deprive GBC of its receivables and otherwise destroy its MCA receivables portfolio.

### Allegations Common to All Counts

54.     GBC was previously in the business of, among other things, providing MCA advances to qualified merchants.  An MCA is an alternative form of financing distinguishable loans, which are subject to usury statutes, pursuant to which an MCA funder, such as GBC, purchases a merchant's future receivables at a discount.

55.     Under New York law[4], an MCA has certain characteristics that distinguish it from a loan.  Specifically, they are (a) there must be a reconciliation provision in the agreement whereby the customer can reconcile regular payments to more closely reflect it actual receivables and obtain a refund of over-collected amounts (including in the event that receivables are never actually generated); (b) the agreement must not have a finite duration, such that if it takes longer

---

[3] The Banana Entities' material misrepresentations of fact and/or omissions of material fact, perpetrated by GEABP, Devorkin and/or Conway, have been laid bare as the New York Supreme Court "rolled back" the preliminary injunction and modified the same on or about January 12, 2024, and, further, clarified what BFG "could or could not do" in terms of collection action pursuant to hearings on March 15, 2024, and April 15, 2024, respectively.  The Court further clarified the same on August 5, 2024, and again on September 17, 2024.

[4] The agreements at issue herein are governed by New York law.

for receivables to be generated by the customer the remittances to the funder will be extended over a longer period; and (c) whether there is any bankruptcy is an event of default under the agreement. *See Principis Capital, LLC v. I Do, Inc.*, 201 A.D.3d 752, 754 (2d Dept. 2022). Under an MCA, the funder is entitled to a set amount of receivables purchased, which amount will never increase.

56.    Loans, on the other hand, require the borrower to repay under all circumstances, in a finite period of time, and usually require the payment of interest or some other increased consideration in the event that it takes longer to pay back the amounts owed.

57.    Under New York's criminal usury statute, Pen. L. § 190.40, a loan which exceed an annal interest rate of twenty-five percent (25%) is criminally usurious.

58.    The New York courts have repeatedly recharacterized MCA or sale of RTR as loans, and found those loans to be criminally usurious and invalid, where either the transactional documents (or the parties' course of conduct and dealing) indicate that the test for treating a financing arrangement as an MCA or RTR is not met. Two (2) such recent New York cases are *Davis v. Richmond Capital Grp.*, 194 A.D.3d 516, 517 (1st Dept. 2021) (purported MCA agreement was loan based on "the discretionary nature of the reconciliation provisions, the allegations that defendants refused to permit reconciliation, the selection of daily payment rates that did not appear to represent a good faith estimate of receivables, . . ."), and *People v. Richmond Capital Grp. LLC*, 2023 N.Y. Slip Op. 50975(U) (N.Y. Co. Sup. Ct. Sep. 15, 2023) (granting attorney general's petition to require purported MCA funders to vacate all funding agreements and judgments, and pay restitution to borrowers, due to the fraudulent and criminally usurious nature of the agreements).

59.     104, a wholly owned subsidiary of BFG, purported to be in the business of providing financing to MCA providers, like GBC, by supposedly purchasing some of the MCA provider's merchants' RTR (that was purchased by the provider - GBC in this case - at a discount), while taking on a commensurate portion of the risk of non-performance by merchants in exchange for a portion of the upside.

60.     Said differently, the Banana Entities *purport* to act *as* an MCA funder *to* MCA funders - giving a cash advance or investment (not a loan) to purchase the MCA funders' receivables at a discount, and assuming the risk of non-performance by the merchants (whereupon the MCA funder customer would have no obligation to pay or otherwise compensate Banana for the advance).

61.     However, the Banana Entities' entire business model which purports to provide MCA financing to parties, such as GBC, is fraudulent given that BFG in practice treats its agreements with MCA funders - which contain provisions to ensure BFG will most always get repaid, regardless of the performance of the underlying merchants - as loans with absolute or static repayment obligations.

62.     The Banana Entities *do not* treat these agreements as purchases of receivables and only uses this description as "window dressing" in a fraudulent effort to avoid usury laws and improperly market its loans to MCA providers misled to believe the Banana Entities, as a supposed participant in the MCA transactions, is sharing the risk of non-performance with a funding participant, rather than taking on debt with absolute or static repayment obligations.

63.     GBC and BFG, by and through 104, entered into a series of agreements, including a Master Funding Agreement, dated June 15, 2022 ("2022 MFA"), and a Master Funding

Agreement, dated November 18, 2020 ("2020 MFA"), and individual PSAs (collectively, the "Banana Agreements") purporting them to be purchases of future receivables; however, the PSAs were in actuality loans.

64.    Upon information and belief, the 2022 MFA, 2020 MFA and individual PSAs were drafted by the Banana Entities' counsel, GEABP, and, more particularly, Devorkin.

65.    Under the Banana Agreements, BFG was to provide an "Advance Amount" as its purchase price (or funding amount) toward a partial amount of the total RTR that Greenwich was purchasing from its own merchants, in consideration for which the Banana Entities obtained a right to receive a partial amount of the RTR being purchased, paid in twelve (12) consecutive, fixed monthly "installments" for a total "Withdrawal Amount" or "Remittance Amount," which reflected only a portion of the total RTR being remitted by the merchant (with the remainder of the RTR belonging to GBC).

66.    Notwithstanding, the Banana Agreements were drafted, and "read" as loans. These agreements contain no mandatory reconciliation provision, have fixed twelve (12) month repayment terms and require personal performance guaranties of repayment of amounts clawed back in a bankruptcy, and contain a provision purportedly enabling the Banana Entities to require delivery of additional merchants or cash to make up for non-performance by the purchased merchants (in other words, providing additional consideration while reducing risk).

67.    The Banana Agreements were also treated by the Banana Entities throughout the course of the parties' business relationship as loans.

68.    At no time, did the Banana Entities ever participate in the risk of non-performance by the so-called "Purchased RTR" (as defined in the MFAs) or reconciled GBC's monthly and

19

overall payments (as is required in a true purchase of receivables) to account for the fact that the Banana Entities were paid in full by GBC despite that certain of the deals listed on the PSAs, in fact, were either may have been non-performing or underperforming merchant deals. The Banana Agreements assume that all deals listed in the PSAs performed and did not default. If they defaulted, the amounts listed in the PSAs should have been reconciled, inasmuch as the 2022 MFA and 2020 MFA each provide in relevant part: "if the merchant cash advance transactions fail to generate the revenue anticipated by MCA [GBC], and the full amount anticipated by FACTOR [104] is not collected then: ... MCA [GBC] would not owe anything to FACTOR [104] and would not be in breach of or default under this Agreement solely because of such failure ... ."

69.     The Banana Entities never reconciled for non-performing or failed MCAs. To the contrary, in the context of the New York Action, the Banana Entities, and more particularly, BFG, by and through GEABP, Devorkin and/or Conway, has affirmatively taken the position that they are entitled to collect one hundred percent (100%) of GBC's receivables (not just its fractional share), including for merchants for whom the Banana Entities was fully paid on the relevant PSAs, merchants that were never on PSAs or who have been "disqualified" by the Banana Entities for non-performance despite being admonished in the New York Action that it was not otherwise entitled to do so.

70.     The Banana Entities not only required the full payment of its monthly remittance installments without ever "truing up," but worse, routinely purported to add through electronic manipulation of its internal so-called "BE System" additional GBC merchants that were not previously listed on a PSA as supposed "Remedy RTR" and to "disqualify" (both terms not

provided for in the MFAs or PSAs) non-performing or underperforming merchant deals (including in at least one case, a bankrupt merchant) in order to decrease the Banana Entities' risk profile and increase its supposed collateral.

71.     As a direct result, GBC's risk profile increased and it was damaged from the loss of collections on merchant deals that had never been "factored" using any of the Banana Entities' funds (which RTR should have exclusively belonged to GBC).

72.     The Banana Entities routinely and unilaterally purported to "reactivate" merchants when it wanted to decrease its risk profile, including in some instances even after the New York Action was commenced.

73.     The Banana Entities maintain that pursuant to the PSAs they purchased one hundred percent (100%) of the Purchased RTR, not a fractional portion thereof.  In other words, the Banana Entities claim to have secured an annual rate in excess of over one hundred percent (100%) (or almost four (4) times the New York criminal usury cap of 25%).  Pursuant to the parties' relationship, GBC remitted and paid the Banana Entities the aggregate amount approximately $19,508,270.38.

74.     Therefore, not only are the PSAs not, in fact, "factoring" but they are loans that have been treated by the Banana Entities in a criminally usurious manner and for which the Bana Entities forfeit any right of collection, and for which the Banana Entities must pay restitution to GBC.

75.     Critically, despite the Banana Entities' representations to the New York Supreme Court that it purchased and owns one hundred percent (100%) of the Purchased RTR, the PSAs make clear that this is not the case.

76.     The Banana Entities obligated themselves to fund either approximately forty percent (40%) or forty-seven percent (47%) of each Purchased RTR (depending upon the PSA at issue), up to the first $70,000.00 or $150,000.00, under the PSAs pursuant to the 2020 and 2022 MFAs, respectively.  The remaining funding was put up using GBC's "house-money" or own funds.

77.     As a result, on the return side, the Banana Entities were not entitled to one hundred percent (100%) of the Purchased RTR, but only to a much lower percentage amount to which it contracted.

78.     Under each PSA, "Aggregated Amount Purchased" was intended to reflect the aggregate amount of the future receivables GBC purchased from merchants, for the "Purchase Price" listed.  However, because under the MFAs, the Banana Entities only willing to fund against the first $70,000.00 (2020 MFA) and $150,000.00 (2022 MFA) of purchased receivables, the "Recognized RTR" was the sum of receivables actually purchased against by the Banana Entities and all receivables above the Recognized RTR belonged to the Bana Entities outright (*i.e.*, 100% of receivables above the Recognized RTR).  The Banana Entities provided GBC with the "Amount Advanced," and in consideration thereof obtained its set "Fee."  The "Amount Advanced" plus "Fee" equals the "Total Remittance," which was remitted to GBC by equal "Monthly Payments" equivalent to one-twelfth (1/12) of the Total Remittance Amount.

79.     The percentage of Purchased RTR that GBC is actually entitled under the PSAs can only be calculated by dividing the "Total Remittance" by the "Total Purchased RTR."

80.     The Banana Entities' total percentage of these Purchased RTR ranged from approximately forty percent (40%) to forty-seven percent (47%).

81.     Under the Banana Agreements, to the extent that a merchant defaulted or otherwise failed or refused to pay GBC any and all of the amounts due and owing pursuant to its MCA Agreement with said merchant(s), GBC was not liable or responsible to the Banana Entities for repayment of any amounts advanced regarding that particular merchant(s).

82.     Beginning on or about December 15, 2020, BFG and GBC entered into a series of PSAs purporting to document the Banana Entities' purchase of certain RTR from GBC. Notwithstanding the language or governing provisions set forth in the Banana Agreements relative to GBC's obligation(s) to the Banana Entities in the event of a merchant default or failure to pay Greenwich, the PSAs purport to prescribe a fixed or static repayment on any amounts advanced to GBC in twelve (12) equal monthly installments, regardless of whether the merchant(s) defaulted.  That said, GBC made all payments - timely and fully - to 104, by and through BFG, under the 2020 MFA and 2022 MFA, respectively, through April 30, 2023, including payments "covering" merchants that defaulted under PSAs.

83.     Under the PSAs that were entered into pursuant to the 2020 MFA the amount that the Banana Entities collected from GBC on defaulted or non-performing merchants totaled at least $1,793,752.64.

84.     The Banana Entities failed and/or refused to reconcile the same, or otherwise credit or return this overpaid amount to GBC, despite the fact that at all times relevant to the 2020 MFA GBC substantially performed, making each and every payment, timely and fully, to Banana, and did not default thereunder.

85.     Under the PSAs entered by into pursuant to the 2022 MFA, GBC has also to date overpaid the Banana Entities at least $2,241,555.94 on merchants that defaulted or failed to

perform. Again, the Banana Entities have provided GBC no credit for the same, and, further, has refused to reconcile the amounts paid to the Banana Entities by GBC.

86.    Such overpayments long preceded the Banana Entities purporting to call an event of default against Greenwich subsequent to April 27, 2023.

87.    Upon information and belief, beginning with the commencement of the New York Action, the Banana Entities, by and through Highmore, Jogia, GEABP, Devorkin and/or Conway, embarked upon a retaliatory campaign of "grabbing" assets of GBC, including without limitation the entirety of GBC's MCA portfolio.

88.    Upon information and belief, among other things, at Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's direction, the Banana Entities endeavored to collect from certain GBC's MCA merchants that were either identified on "closed out" or paid in full PSAs, or otherwise not listed on any PSA.

89.    Further, upon information and belief, at Highmore's Jogia's, GEABP's, Devorkin's and/or Conway's direction, the Banana Entities communicated with GBC merchants that were never pledged to or otherwise "tied" to the Banana Entities, including without limitation certain merchants not appearing on any PSAs, and, so doing, advising said merchants that the Banana Entities either "purchased", "assigned", "taken over" or "foreclosed" upon all GBC RTR, and, as such, the merchants were to pay the Banana Entities, and not GBC even though the issue of what constitutes "Purchased RTR" has been raised and is being litigated in the New York Action. Even more, upon information and belief, at Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's direction, the Banana Entities regularly endeavored to

compromise performing merchants' obligation in a "money grab" by the Banana Entities, which undoubtedly resulted in an artificial deficiency.

90.     In addition, upon information and belief, at Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's direction, the Banana Entities routinely advised GBC merchants, whether pledged or otherwise, the GBC is "no longer in business".

91.     Moreover, upon information and belief, upon information and belief, at Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's direction, the Banana Entities communicated with GBC merchants on PSAs "closed out" or paid in full demanding that said merchants still pay the Banana Entities insofar as there still remained a balance due (which otherwise belonged to GBC), and indicated that these merchants did not receive a credit for any prior payments.

92.     Upon information and belief, beginning on or about July 5, 2023, at GEABP's, Devorkin's and/or Conway's direction, the Banana Entities began directing merchants, whether "pledged" to the Banana Entities or not, whether performing or not, or whether on "open" or "closed" PSAs, to divert payments aways from GBC's payment processor, *to wit*, VeriCheck, Inc., d/b/a ACHWorks.  Said action created derision and/or confusion within the GBC MCA portfolio resulting in disproportionately or unusually "high" payment return rates which caused VeriCheck, Inc., d/b/a ACHWorks to terminate its payment processing relationship with GBC leaving GBC without any payment processor, and thereby adversely impacting collections of RTR within the GBC MCA portfolio.

93.     Upon information and belief, in or about January, 2024, the Banana Entities defaulted with its secured creditor, *to wit,* Highmore.  At or about that time Highmore displaced

25

or removed the Members of the Banana Entities, and assumed ownership of 104 and BFG, and each of them. Jogia has since held himself out as the Managing Member of the Banana Entities.

94.     On or about January 12, 2024, the New York Supreme Court modified the June 21, 2023 preliminary injunction restricting the Banana Entities' collection activities to *only* those merchants specifically identified or listed on a Schedule A appended to a PSA. Additionally, on March 15, 2024, and again on April 15, 2024, the New York Supreme Court clarified its January 12th determination to foreclose the Banana Entities from engaging in collection action with regard to any merchant listed on a Schedule A appended to a "closed out" or paid in full PSA.

95.     Notwithstanding, upon information and belief, since assuming ownership of the Banana Entities, Highmore, by and through Jogia, GEABP, Devorkin and/or Conway, or any of them, have continued to collect from GBC merchants identified on Schedules A appended to "closed out" or paid in full PSA. Similarly, upon information and belief, against at the direction of Highmore, Jogia, GEABP Devorkin and/or Conway, or any of them, the Banana Entities have collected from GBC merchants that are not listed on any Schedule A appended to a PSA.

96.     Even more, Highmore, by and through Jogia, GEABP, Devorkin and/or Conway, or any of them, have collected and/or attempted to collect from GBC merchants on "open" PSAs, but for whom the Banana Entities received all of the monies to which it was entitled to for that particular merchant. One such merchant is JEPM Electric, LLC ("JEPM"), which appears on "open" PSA #58. The Banana Entities advanced to GBC, on account of JEPM, the total sum of $70,500.00, with a required "payback" of $82,485.00. The balance of JEPM's RTR belongs or is owned by GBC. That said, GBC repaid the Banana Entities the sum of $89,485.00, which

resulted in an overpayment to the Banana Entities of $7,245.87. Thus, the Banana Entities received the full amount (and more) from GBC to which it was entitled for JEPM.

97.     Regardless, and in complete disregard for the same, the Banana Entities, at the direction of Highmore, Jogia, GEABP, Devorkin and/or Conway, or any of them, commenced legal action in the State of Texas against JEPM seeking to collect an additional approximately $119,000.00 to which the Banana Entities have neither right nor entitlement. As a result, a default judgment was secured against JEPM, which caused JEPM to default upon its remaining obligation(s) with GBC, which is otherwise neither tied to or pledged to the Banana Entities, as well as adversely impacted JEPM's business, including access to depository accounts, interfering with its business operations and preventing performance under contracts with third parties.

### Count I - Breach of Contract

98.     GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 97 above as if more fully stated herein, and, further, incorporates the same herein by reference.

99.     GBC entered into legally valid, binding and enforceable agreements, *to wit*, the MFAs and PSAs, respectively.

100.    At all times relevant hereto, GBC performed in accord with, and pursuant to the MFAs and PSAs, respectively.

101.    Highmore and/or Jogia, or either of them, on behalf of the Banana Entities, have breached or violated the express provisions, terms and/or conditions of the MFAs and/or PSAs, respectively, by willfully failing and/or refusing to comply with the same.

102.    As a direct and proximate result of Highmore's and/or Jogia's respective wrongful conduct, GBC has been, and continues to be damaged, harmed and/or injured.

103.    There exists no justiciable issue of either law or fact, and Highmore's and/or Jogia's willful breach of the MFAs and/or PSAs, respectively, is wholly unjustified.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of GBC, and against Highmore and/or Jogia, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all attorneys' fees and costs incurred herein pursuant to R.I. Gen. Laws §9-1-45, as well as any and all other costs and expenses incurred by GBC in the instant action, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

### Count II - Breach of Inherent Duty of Good Faith & Fair Dealing

104.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 103 above as if more fully stated herein, and, further, incorporates the same herein by reference.

105.    Inherent in every contractual relationship is the contracting parties' obligation of good faith and fair dealing with each other.

106.    Highmore and/or Jogia, and each of them, breached their duty of good faith and fair dealing with GBC.

107.    As a direct and proximate result of Highmore's and/or Jogia's breach of good faith and fair dealing, GBC has been, and continues to be, damaged, harmed and/or injured.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of

GBC, and against Highmore and/or Jogia, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all costs and expenses incurred herein, including without limitation attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

### Count III - Unjust Enrichment

108.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 107 above as if more fully stated herein, and, further, incorporates the same herein by reference.

109.    GBC substantially performed pursuant to the MFAs and/or PSAs, which bestowed a value or benefit upon Highmore and/or Jogia, and each of them.

110.    GBC has not received the full value and/or benefit of the MFAs and/or PSAs as otherwise required by said agreements.

111.    Highmore and/or Jogia, and each of them, have benefitted, and continue to benefit, from the MFAs and/or PSAs.

112.    It would be inequitable for Highmore and/or Jogia, or either of them, to retain the value and/or benefit of the MFAs and/or PSAs without GBC being fully compensating or receiving the full benefit of the same.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of GBC, and against Highmore and/or Jogia, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all costs and expenses incurred herein, including without limitation attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

### Count IV - Fraud

113.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 112 above as if more fully stated herein, and, further, incorporates the same herein by reference.

114.    At all times relevant hereto, Highmore, Jogia, GEABP, Devorkin and/or Conway, or any of them, made material misrepresentations of facts and/or made omissions of material fact *vis-à-vis* the MFAs and/or PSAs to the court in the New York Action and/or GBC's MCA clients as to the Banana Entities' right, title and/or interest in GBC's RTR under the MFAs and/or PSAs.

115.    Upon information and belief, the court in the New York Action and/or GBC's MCA clients reasonably relied upon Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's representations and/or omissions as to the Banana Entities' right, title and/or interest in GBC's RTR under the MFAs and/or PSAs to GBC's detriment.

116.    Upon information and belief, Highmore, Jogia, GEABP, Devorkin and/or Conway, or any of them, induced certain action and/or inaction by the court in the New York Action and/or GBC's MCA clients based upon their respective representations and/or omissions.

117.    Even more, Highmore, Jogia, GEABP, Devorkin and/or Conway, or any of them, defrauded GBC through the misuse and/or misappropriation of GBC's assets and/or property *vis-à-vis* GBC's business relationship with the Banana Entities.

118.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin and/or Conway's respective intentional and wrongful conduct, GBC has been, and continues to be, injured harmed and/or damaged.

WHEREFORE, GBC respectfully prays that this Court enter judgment in favor of GBC,

and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court assess as against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, punitive damages as a result of their respective willful and wanton conduct sufficient to deter Highmore's Jogia's GEABP's Devorkin's and/or Conway's such future conduct, that this Court award to GBC any and all costs and expenses incurred herein, including without attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

### Count V - Misrepresentation

119.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 118 above as if more fully stated herein, and, further, incorporates the same herein by reference.

120.    At all times relevant hereto, Highmore, Jogia, GEABP, Devorkin and/or Conway, or any of them, made misrepresentations of material fact and/or omitted material facts to the court in the New York Action and/or to GBC's MCA clients to GBC.

121.    Upon information and belief, the court in the New York Action and/or GBC's MCA clients reasonably relied upon Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's misrepresentations with regard to the MFAs and/or PSAs to GBC's detriment.

122.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's intentional and wrongful conduct, GBC has been, and continues to be, injured harmed and/or damaged.

WHEREFORE, GBC respectfully prays that this Court enter judgment in favor of GBC,

and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court assess Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, punitive damages as a result of their willful and wanton conduct sufficient to deter Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's such future conduct, that this Court award to GBC any and all costs and expenses incurred herein, including without attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

## Count VI - Tortious Interference with Contract

123.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 122 above as if more fully stated herein, and, further, incorporates the same herein by reference.

124.    Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, knew, or should have known, of the contractual relationships between GBC and certain third parties.

125.    Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, by and through their respective wrongful conduct, tortiously interfered with said contracts.

126.    Said tortious interference was willful and knowing.

127.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's intentional and wrongful conduct, GBC has been, and continues to be, damaged, harmed and/or injured.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of GBC, and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly

and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all costs and expenses incurred herein, including without limitation attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

### Count VII - Tortious Interference with Prospective Business Advantage

128.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 127 above as if more fully stated herein, and, further, incorporates the same herein by reference.

129.    Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, knew, or should have known, of the expectancy of certain business relationships by and between GBC and third parties.

130.    Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, tortiously interfered with said business relationships.

131.    Said tortious interference was willful and knowing.

132.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's intentional and wrongful conduct, GBC has been, and continues to be, injured, harmed and/or damaged.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of GBC, and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all costs and expenses incurred herein, including without limitation

attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

## Count VIII - Civil Conspiracy

133.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 132 above as if more fully stated herein, and, further, incorporates the same herein by reference.

134.    Upon information and belief, Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, conspired to make material misrepresentations,  conceal or withhold material facts, fabricate action or conduct, and/or violate or breach contractual provisions or otherwise defraud GBC.

135.    Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's respective conduct was intentional and knowing.

136.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's respective intentional and wrongful conduct, GBC has been, and continues to be, damaged, harmed and/or injured.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of GBC, and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all costs and expenses incurred herein, including without limitation attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

### Count IX - Negligence

137.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 136 above as if more fully stated herein, and, further, incorporates the same herein by reference.

138.    Highmore, Jogia, GEABP, Devorkin and/or Conway owed GBC a duty to act with care, diligence and/or otherwise refrain from acting negligently and/or recklessly.

139.    Highmore, Jogia, GEABP, Devorkin and/or Conway breached the duty owed to GBC.

140.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin and/or Conway's negligence, GBC has been, and continues to be, damaged, injured and/or harmed.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of GBC, and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all costs and expenses incurred herein, including without limitation attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

### Count X - Breach of Fiduciary Duty

141.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 140 above as if more fully stated herein, and, further, incorporates the same herein by reference.

142.    Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, owed

GBC a fiduciary duty of utmost loyalty, fidelity and care to act for GBC's benefit and best interest with regard to their performance and discharge of their obligations pursuant to the MFAs and/or PSAs.

143.    Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, breached their fiduciary duty to GBC.

144.    Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's respective breach of fiduciary duty to GBC was willful, wanton and intentional.

145.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's intentional and wrongful breach of fiduciary duty, GBC has been, and continues to be, damaged, injured and/or harmed.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of GBC, and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all costs and expenses incurred herein, including without limitation attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

**Count XI - Violation of R.I. Gen, Laws §7-15-1, *et seq.*, Racketeer Influenced & Corrupt Organizations Act**

146.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 145 above as if more fully stated herein, and, further, incorporates the same herein by reference.

147.    The Banana Entities are enterprises within the meaning of R.I. Gen. Laws §7-15-

36

1, *et seq.*

148.    Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, knowingly participated in the Banana Entities' willful and intentional schemes adverse to GBC under the guise of the MFAs and/or PSAs.

149.    Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, knowingly received and/or derived a financial benefit and/or gain by and through their respective participation under the guise of the MFAs and/or PSAs.

150.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's respective wrongful conduct, GBC has been, and continues to be, damaged, injured and/or harmed.

WHEREFORE, GBC respectfully prays that that this Court enter judgment in favor of GBC, and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, in an amount to be proven at trial, together with interest thereon, that this Court award to GBC any and all costs and expenses incurred herein, including without limitation attorneys' fees, and that this Court award to GBC such other further relief as this Court may deem fair, just and reasonable.

### Count XII - Bad Faith Disposition of Collateral

151.    GBC restates and realleges its allegations and averments set forth in Paragraphs 1 through 150 above as if more fully stated herein, and, further, incorporates the same herein by reference.

152.    The acts and/or omissions of Highmore, Jogia, GEABP, Devorkin and/or Conway,

and each of them, as complained of herein, and yet discovered herein, constitute bad faith, particularly as the same relates to GBC's collateral, assets and/or property.

153.    As a direct and proximate result of Highmore's, Jogia's, GEABP's, Devorkin's and/or Conway's respective wrongful conduct, GBC has been, and continues to be, injured, harmed and/or damaged.

WHEREFORE, GBC respectfully prays for judgment in favor of GBC, and against Highmore, Jogia, GEABP, Devorkin and/or Conway, and each of them, jointly and severally, in an amount to be proven at trial, together with legal interest thereon, that this Court award punitive damages in favor of GBC, and against Highmore, Jogia, GEABP, Devorkin and/or Conway, in an amount sufficient to penalize them, as well as discourage Highmore, Jogia, GEABP, Deviorkin and/or Conway from such future bad faith conduct, that this Court award to GBC any and all attorneys' fees incurred herein pursuant to R.I. Gen. Laws §9-1-45, as well as any and all other costs and expenses incurred by GBC in the instant action, and that this Court award to GBC such other further relief this Court may deem fair, just and reasonable.

Respectfully submitted,

Greenwich Business Capital, LLC

By its Attorney,

/s/ Christopher M. Mulhearn
Christopher M. Mulhearn (#5188)
Law Office of Christopher M. Mulhearn, Inc.
100 Centerville Road, Suite 1
Warwick, RI  02886
Tel.: (401) 533-9330
Email: cmulhearn@mulhearnlawri.com

Dated: October 21, 2024